**Ruby R. MARTIN, Appellant,**

v.

**SECRETARY OF DEPARTMENT OF HEALTH, EDUCATION AND WEL-FARE, Appellee.**

**No. 73-1298.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1973.

Decided March 5, 1974.

Robert O. DuPre, Anderson, S. C., for appellant.

Jean A. Staudt, Atty., U. S. Dept. of Justice (Harlington Wood, Jr., Asst. Atty. Gen., Morton Hollander, Atty., U. S. Dept. of Justice, John K. Grisso, U. S. Atty., on brief), for appellee.

Before WINTER, FIELD and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Ruby R. Martin was denied Social Security disability benefits by the Secretary, notwithstanding her claim of inability to engage in any substantial gainful activity because of diabetes and high blood pressure. The district court found that there was substantial evidence to support the Secretary's denial of her

claim. From our analysis of the record, we conclude to the contrary. We conclude also that a regulation of the Secretary—or the interpretation, adopted by the hearing examiner and Appeals Council—making end organ damage an exclusive prerequisite to a finding of disability from hypertensive vascular disease cannot be given that effect. We reverse the district court's judgment and remand the case with directions to require the Secretary to grant the claimed benefits.

## I.

There is no dispute that Mrs. Martin has suffered from diabetes for an undisclosed number of years and that she has had severe hypertension since at least 1962. Presently 49 years old, she claimed that she became disabled on November 23, 1966. Her fully insured status under the Social Security Act extended until December 31, 1971. Prior to the cessation of employment on November 23, 1966, she worked for 23 years in a mill as a weaver. She has an eighth grade education. In addition to diabetes and severe hypertension, she underwent a single, simple mastectomy in 1969 for adenocarcinoma of the breast, benign cysts were removed from her other breast, and in 1970, a 30% loss of hearing in each ear was medically detected, as well as "grade two" arterial changes in her eyes. Fortunately, there has been no later evidence of carcinoma of the breast and that condition, as well as the hearing loss, are not asserted as the cause of her claimed disability; they are relevant only with regard to possible employment available to her if it is determined that she has any residual functional capacity to work.

The dispute in the case revolves about whether Mrs. Martin does have any residual functional capacity to work. On this issue, she claims that she has headaches and shortness of breath when she walks upstairs, that she has dizzy spells severe enough to induce nausea and vomiting, that she occasionally loses her orientation not knowing where she is or what she is supposed to do, that she is unable to operate a motor vehicle, and that she is intermittently so weak that she is bedridden. The greatest physical activity of which she is capable is to be around the house, to make her own bed, and to walk slowly for short distances.

Mrs. Martin's medical records amply document her physical complaints, diseases and physical impairments. Both Mrs. Martin's personal physician and the neutral, impartial physician of the South Carolina Vocational Rehabilitation Department support her claim that she is physically unfit for any employment. Dr. Thomason, her personal physician, reported in April, 1970, that:

[i]t is my impression that because of her severe hypertension which has persisted under intensive treatment and which she is very cooperative with in following the treatment, along with her diabetes and carcinoma of the right breast, for which only a simple mastectomy was done, I believe this patient is eligible for total, permanent disability for any gainful employment.

Dr. Poole, an impartial internist acting as consultant for the South Carolina Rehabilitation Department, conducted a comprehensive consultative examination of Mrs. Martin. After reporting his physical findings, he stated:

This patient has two major problems each of which singularly being able to produce profound vascular degeneration and which in combination is a truly deadly pair of diseases.

It is not known why her antihypertensive treatment is not more vigorous than it appears to be and it is possible that a considerably lower level of blood pressure reading could be obtained simply by addition of adequate amounts of thiazide to the methyl dopa which could be increased if necessary.

In addition more attention to her diet and an increased intake of one of the

sulfonyl ureas, Dymelor could probably further improve the regulation of her diabetes.

However, *it is the opinion of this examiner that her hypertension is so severe and has been of sufficient duration as to preclude returning her to a semblance of good health.* Furthermore, she has a major impairment in her hearing which seems to be of the conduction type and this can be expected to get worse. (Emphasis added).

The only evidence to show that Mrs. Martin's claim was not well founded was the opinion of Dr. William W. Pryor, the Social Security Administration's non-examining doctor who testified at the hearing and who submitted a report. Dr. Pryor's report and testimony were based solely upon Mrs. Martin's medical records. He conducted no examination or independent tests. He found that Mrs. Martin had had "essential" hypertensive vascular disease for at least ten years without end organ damage, although she did have some narrowing of the arteries and "Grade II retinophy." He found no evidence of renal impairment, actual cerebral hemorrhages or stroke, or any organic damage to the brain. He confirmed that she had diabetes which had been documented, but again there was no evidence that the diabetes had produced organ damage. He confirmed that her breast had been removed because of carcinoma, but that for two years there had been no recurrence of the disease. In his testimony, he repeated that she had "essential hypertension"—"extremely high diastolic pressures"—and diabetes without organ damage.

Based upon these adopted findings, he expressed the opinion that there was no physical reason why Mrs. Martin could not do light or sedentary type work.[1] He did testify that she had been treated

at the National Institute of Health because she suffered with unusual hypertension, and that NIH would not have undertaken her treatment had she not been an exceptional case. He also said that she could not perform a job where she was required to reach down and up all day because she would become dizzy, and that she could not do well in a production job where output was a major consideration.

A vocational expert for the Social Security Board testified that in the area of light and sedentary work, Mrs. Martin could be a cashier, work as a personal assistant or attendant, work as a toolroom attendant, inspect shirts, or pack shirts. When reminded that Mrs. Martin had a hearing impediment, he agreed that her ability to work as a cashier would be adversely affected.

The hearing examiner's recommendation that her claim be rejected, adopted as correct by the Appeals Council, was predicated upon his findings that although Mrs. Martin has hypertension and diabetes, there has been no end organ damage resulting from either disease, that Mrs. Martin's impairments, taken singly or in combination, do not preclude her from a light or sedentary job, and that there are jobs existing in the national and local economy within her capabilities, such as cashier, laundry attendant in a launderette, folder and fluffer in a launderette, cashier at a movie theater, cashier at a restaurant, shirt inspector, or shirt packer. He therefore concluded that the evidence failed to establish that Mrs. Martin's impairments prevented her from engaging in substantial, gainful activity for any continuous period which lasted, or could be expected to last, for twelve months.

## II.

█ The examiner's rejection of Mrs. Martin's claim can be supported only by

---

I. Dr. Pryor agreed that an employer subject to workmen's compensation laws, or an employer who required a medical examination as a condition precedent to employment, would not employ her; but this testimony

was irrelevant under the definition in 42 U. S.C. § 423(d)(2)(A) which excludes "whether he [a disability claimant] would be hired if he applied for work" as a criterion for determination of disability.

the opinion evidence of the *non-examining* Social Security doctor. Thus, the legal question presented is whether that evidence is substantial enough to sustain the result when (a) the claimant's subjective evidence of disability, (b) the expert medical opinion of *examining* physicians, (c) claimant's vocational history, and (d) the objective medical facts, are all to the contrary. We think not.

Hayes v. Gardner, 376 F.2d 517 (4 Cir. 1967), is directly in point, not only on the facts but on the law. In *Hayes*, which followed Underwood v. Ribicoff, 298 F.2d 850 (4 Cir. 1962), we held, where the claimant's principal complaint was hypertension, that the opinion of a doctor who never examined or treated the claimant could not serve as substantial evidence for a finding of non-disability when it was, as in the instant case, at odds with the objective medical facts, claimant's uncontradicted subjective evidence, the opinion evidence of claimant's examining physicians, and her vocational background. Unless our holding in *Hayes* has been modified by a later decision of the Supreme Court, or the Secretary's regulations—questions which we will presently reach—it is dispositive. We would not be disposed to alter it unless required to do so, because we think that an examination of a claimant adds such significant weight to a medical opinion as to the presence or absence of disability that, without it, the opinion, standing alone, cannot constitute substantial evidence to support a conclusion which relies solely on it. See Browne v. Richardson, 468 F.2d 1003, 1006 (1 Cir. 1972).

We did not depart from this view in Kyle v. Cohen, 449 F.2d 489 (4 Cir. 1971), where we upheld the Secretary's denial of benefits. *Kyle* was not a case in which the non-examining physician's opinion was the only evidence to support the examiner's finding of no disability. In *Kyle*, the opinion evidence unfavorable to the claimant consisted "primarily" of the testimony of the Social Security Administration's medical advisor and the administration's vocational expert. However, three other physicians had examined Kyle, and two or more of them were also of the opinion that Kyle was not disabled. See 449 F.2d at 491. Thus *Kyle*, unlike the present case, presented a situation in which the medical advisor's testimony was corroborative of the opinions of physicians who had examined the claimant. Significantly, our opinion in *Kyle* distinguished the previous holding in *Hayes* on the ground that in *Hayes* the "only basis for the Secretary's decision was the opinion of the expert medical witness who did not examine the claimant." 449 F.2d at 492.

The decision of the Supreme Court in Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), did not alter our decision in *Hayes*. *Perales* not only addressed a different question from that presented in the instant case and *Hayes*; read closely, it offers support for our conclusion that a non-examining physician's opinion cannot, by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record.

In *Perales*, the question was whether the medical opinion of a physician who had examined the claimant could serve as substantial evidence supporting the denial of a claim of disability when the physician's opinion was introduced in the form of a written report, the examining physician was not available for cross-examination, and his report was contradicted by the claimant's oral testimony and that of his treating physician.[2] The Court held that the

---

2. It is true that in *Kyle*, 449 F.2d at 492, we said that *Perales* held that "written reports may constitute substantial evidence within § 205(g) of the Social Security Act to support rejection of disability claims, notwithstanding the presence of directly opposing testimony by the claimant and direct medical testimony favorable to him" (footnote eliminated), but the written report was based upon an actual examination. Here, the written opinion was arrived at without claimant's being examined or seen.

written report, "despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the supporting physician and thereby provide himself with the opportunity for cross-examination . . . ." 402 U.S. at 402, 91 S.Ct. at 1428.

Although *Perales* did not address the question of the weight to be accorded a non-examining physician's conclusion of an absence of a disability,[3] we find significance in Mr. Justice Blackmun's repeated reference to the fact that the medical reports in question—admissible even though hearsay—were the product of a medical examination of the claimant. See, e.g., 402 U.S. at 402, 403, 404, 91 S.Ct. 1420. Moreover, the opinion described the function of a non-examining physician as one of explaining medical tests and procedures to the layman examiner and translating medical terminology into ordinary usage. 402 U.S. at 408, 91 S.Ct. 1420. The non-examining physician in *Perales* did express an opinion, but the court was careful to note that his opinion "did not differ from the medical reports" of the examining physicians. 402 U.S. at 408, 91 S.Ct. at 1431.

### III.

■ Both the report and the testimony of Dr. Pryor, the non-examining physician, pointed out that Mrs. Martin had suffered no end organ damage as a result of either hypertension or diabetes, or both, and the trial examiner found this as an ultimate fact in rejecting her claim of disability. Undoubtedly Dr. Pryor and the hearing examiner had reference to the listing of impairments contained in the appendix to the Secretary's regulations in 20 C.F.R. Appendix to Sub-part P, part 404, §§ 4.00 and 4.03. Sub-section C of § 4.00 provides, in part, that "[h]*ypertensive vascular disease* produces disability when it causes complications in one or more of the four main end organs; i.e., the heart, the brain, the kidneys, and the eyes (retinas)." Section 4.03 defines further, by reference to other sections, the types of complications to the four main end organs resulting from hypertensive vascular disease which may constitute disability.

In this case, there was only slight evidence of end organ damage to the eyes and heart.[4] Nevertheless, to the extent that the regulations treat the specified end organ damage as an exclusive prerequisite to the establishment of a disability from hypertension or diabetes, or the hearing examiner may have interpreted the regulations to have this effect, we think the regulation or its interpretation invalid. Nothing in the Social Security Act requires rejection of a disability claim for hypertension or diabetes simply because the claimant has not yet experienced end organ damage. Rather, the Act prescribes as the test for the award of disability benefits the inability of the claimant "to engage in any substantial, gainful activity by reason of any medically determinable physi-

---

3. See Browne, supra, 468 F.2d at 1006.

4. Arterial changes to claimant's eyes have been noted. Additionally, Dr. Pryor reported:

   The chest appears normal to physical inspection and the sites of the recent breast operations are noted. The heart seems to be normal in size, shape and position and the heart sounds are of average quality, the aortic second sound being louder than the pulmonic second sound.
   * * * * *
   A six foot chest film shows the heart not grossly enlarged but the heart has the appearance of beginning of left ventricular hypertrophy. The arch of the arota [sic] is slightly more prominent than usual but there is no calcification.

cal or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. §§ 416(i)(1) and 423(d)(1)(A). Short of evidence that hypertension or diabetes, or both, can only prevent a person from engaging in any substantial gainful activity when it results in end organ damage, we do not think that the Secretary has the authority to say that end organ damage is an exclusive precondition to the establishment of a disability from hypertension. There is no such evidence in this case, and the Secretary has general rule-making authority only to promulgate regulations "not inconsistent" with the provisions of the Act, 42 U.S.C. § 405. As we have shown, the Act does not limit disability as a result of hypertension to cases where end organ damage has resulted if the other prerequisites to prove disability have been established. We have no doubt that the regulation is a handy guide to lay examiners to advise them when disability from hypertension has unquestionably resulted, but the regulation cannot be construed to establish the exclusive means by which the showing may be made.

## IV.

In our view, the only substantial evidence shows that Mrs. Martin was disabled within the meaning of the Act and she should have been awarded disability benefits. We will reverse the judgment of the district court upholding the Secretary's adverse determination, and direct it to remand the case to the Secretary for a proper award. Since the record does not reflect the precise date that Mrs. Martin's disability had lasted, or could be expected to last, for not less than 12 months, the Secretary should make that determination.

Reversed and remanded.